Good morning, Your Honors. May it please the Court, my name is David Avery. I'm from the Missoula branch of the Federal Defenders of Montana. I'm here on behalf of Joel Wyatt and Rebecca Smith. First of all, I'd like to thank the Court for a full 20 minutes on the misdemeanor case. I may have been dreaming when I heard that, but that's it. But you're not compelled to use it, though. And that said, I would actually like to reserve five minutes for rebuttal, please. As you may do, sir, counsel. Thank you. We're here 500 miles away from Missoula District Court, so I'm going to make Mr. Van der Wettering more comfortable and offer something of a mea culpa. When I got this case, I wasn't with the Federal Defenders. I was a private attorney, and it was, I think, my third CJA panel case. And so it was a very serious misdemeanor case, and they called in David Avery. And I was very excited about the case. At that point, four infractions had been charged. The hazardous and dangerous statute had not been invoked by the government. And so we had the initial appearance, and I was speaking with Mr. Van der Wettering, just talking to him about where he saw this case going, and he informed me that the Forest Service was interested in some restitution. And so that, I think, was the most important aspect of the case at that point. And I, being into research, went back to my office and very quickly studied up on Title 18-355 ‑‑ I'm sorry, the 3663 and 3663A, the restitution, mandatory restitution statutes. And determined that restitution is not available unless a Title 18 offense is alleged. And I was wrong. But, of course, I was so excited that I had to go and tell Mr. Van der Wettering that. And that came back and bit me, and I apologized to my clients for that, because eventually a Title 18 offense was alleged. And as I said, I was wrong, because the conditions of probation statute allows restitution to be imposed when probation ‑‑ Well, what do you think is your strongest argument on appeal right here? Well, I think that what I'm getting to, Your Honor, is that I don't think that anybody, the government, the Forest Service, anybody involved with the protest, saw this as a hazardous or injurious device offense until this issue of restitution came up. And that speaks to the vagueness, as applied, of the statute. These are ropes that are out in the open. Everybody saw them. In fact, they were seen by the helicopter expert at 4 o'clock in the morning when he drove by the protest site on the very first day. At that point, the tree sit, the sits where they were up on the trees, had only been set up for several hours. The ropes were there for a few hours. So the first chance that anybody ever had a chance to see these ropes, they were seen in the dark. Yeah, but the statute says lines or wires in D3. Isn't that enough? Well, I think, Your Honor ‑‑ It's not whether they're visible or not. It's whether there's a hazard. Well, I think that gets to the whole question of whether ‑‑ This is an interesting definition, and it has a very generalized catchall description of hazardous or injurious devices at the beginning. And basically says that it's anything that's, when it's assembled or placed, can, you know, can cause harm by any person making contact with it. And as we argued in our brief, that, I mean, that describes anything. I mean, somebody can impale themselves on a tent stake or can trip over a tent rope, a rope that's holding up a tent. I mean, and that's coming into contact with that item and thereby hurting yourself. And so the question becomes, well, how is the definition more specific? And Congress, in its wisdom, included a long list of examples. And they all are things which have been dangerously modified and or placed in some way that they're hidden. And the legislative history bears that out, too. It talks about things that are booby traps, things that are hidden and therefore dangerous because somebody doesn't know about them. Now, you see the word lines or wires in the definition. And this becomes a grammatical question almost. Does the word sharpened, which appears in front of stakes, lines or wires, does that word modify just stakes or does it modify lines or wires? Can you think of an example of a sharpened wire or a sharpened line? I certainly can't. Actually, Your Honor, as also is talked about in our brief, there were the sharpening of wires and lines. And when I use the word line, I don't really think of rope necessarily so much as a metal wire, has taken place since in B.C. Greece. And there are devices that now are still being made to sharpen wires. Now, barbed wire is the word. Barbed wire, Your Honor, is the word. From the West, we all know barbed wire. Exactly. But isn't the difference like the tent stake is, of course, you go out and you pitch your tent and it's got some wires. But in doing that, you're not doing it in reckless disregard to a risk because short of a bird flying over, I mean, you're not expecting something to be impaled on your tent stake or your tent wire. Here, the person puts it in a timber operation right smack in the middle of this timber operation place where you've got helicopters flying around doing timber harvesting. So I agree that if it's lines and wires and that part is clear, the real question then comes down to you have to do it or they have to prove it's with reckless disregard. And isn't that what changes your situation from the camper? Your Honor, actually, the statute allows for more than one. It's got an alternative mental state. One of them, my clients were not charged under the reckless disregard part. They were charged under with the intent to obstruct the harvesting of timber. Okay. So even easier, even easier. Oh, very easy to prove. But here's the perfect analogy is suppose my clients had, instead of doing a tree sit, had gone there and protested with signs and they had maybe set up a sign. They're there to obstruct the harvesting of timber. Say, this is not the right way to log this burned forest. And they've got signs there. And a logger runs into their sign or impales himself accidentally or on purpose. Is that sign, is that what the statute's meant to, I mean, to capture? And it certainly would fit into the definition of something that's been placed. And by the action of any person making contact with such device, subsequent to the assembly or placement causes bodily injury. Well, you have to have the injurious device. Then you have, I mean, you have to have the intent. I guess the intent is not disputed here. They say they really wanted to disrupt timber operations. Correct? They were harvesting. Yeah, they were harassing the part. Well, that takes care of the intent. So that goes to Part A. And then the only other part, and that's kind of clear. And Part B is whether this is a hazardous or injurious device. And if it's lines or wires that could get, by virtue of their location and height, tied up with helicopters, which everyone knows are being used, it seems kind of obvious that the statute gave them notice. Your Honor, here's the problem. Okay. The position where they were, the place where they were, was to become a logging helicopter landing site. But because there were trees there, and this is the unequivocal testimony, there's no way that any helicopters, logging helicopters, could use that site until those trees were removed. And that was going to require deforesting the trees, then bulldozing the ground. So while those trees were there, there were not going to be any logging helicopters anywhere near that spot. Now, sure, they were a half mile away, and there were other stands of trees that were being logged, and those logs were being dropped at other logging helicopter sites. But this was just a proposed landing site at that point. And so, you know, the middle of the trial, we suddenly hear that, well, actually the helicopters that we're worried about are these medical evacuation helicopters. That didn't come out in discovery. We didn't know about that. And suddenly we have the helicopter expert testifying that, oh, I designated that as a medical emergency landing site. And by the way, there's a piece of paper back in one of my logging trucks that says that. I didn't share that with you when you interviewed us. And I don't have it here today, but I promise you that's, I mean, I designated that as a medical landing site and take my word for it. That was the new theory at trial. So if there was going to be a helicopter there, it wasn't going to be a logging helicopter because they couldn't land there. OSHA wouldn't allow them to be anywhere near there because of the logs, the trees that were still there. Was there testimony that simply because of helicopter traffic, that having obstructions at that height posed a risk, apart from whether they were actually going to land, but the fact that there was helicopter traffic in the area? No, Your Honor. The testimony had to do with helicopters that were trying to use that site, whether they were logging helicopters that were holding a log, you know, there would be a log hanging from a rope. And then that log or the helicopter could hit one of the wire, sorry, one of the ropes at issue in this case. The testimony was those helicopters weren't going to be anywhere near here because the trees were still there. And also everybody knew that my clients were in the trees, too. Wasn't there an emergency landing site? What's that? Wasn't there an emergency landing site right at that area? I learned that at trial. I mean, it's either in the record or not. There was testimony that that was designated. The point is, though, that nobody else, and whatever my clients are and also the people they protest with, they're very, I mean, they study the forest. They study policy. They've looked into this, and they knew that there was a proposed landing site, but there was no public documentation or record that this was a designated emergency landing site. They had no knowledge that there was any chance that a different kind of helicopter might come or be beckoned, called to this spot. There was just no way for them to know that. But wasn't there an intent to prevent helicopters from using this area by stringing the wires? There was. So it's sort of self-defeating for you to say that these weren't landing sites, these weren't possibilities of helicopter accidents because the trees hadn't been removed. As far as your clients were concerned, there was a clear and present danger that helicopters were going to use this site, and that's exactly why they strung the wires, isn't it? Well, first of all, Your Honor, the testimony is that my clients actually didn't string the wires. I mean, somebody else strung the wires. They just adjusted them, or they were up there in the trees with them. And the rest of the testimony is that I'm not sure that my clients know why the ropes were put there by whoever put them there. To me, it's as symbolic as it is anything else. But the testimony was clear that there weren't going to be any helicopters, logging helicopters there while the trees and or persons in the trees were there. So there wasn't – there's no way that they could think there's going to be helicopters coming here because they know that the trees would prevent that, and the thing – Medical emergency – medical evacuation helicopters and emergency landing sites were proven at the trial. There was testimony that there was a designated emergency site. I just want to point to some evidence that – there's a lot of evidence that no one else knew that this was a danger either. It took, like I said, two and a half months before the superseding indictment came down after their arrest. I mean, that happens a lot in felony cases. But, I mean, this is a – these are four infractions that turned into a Class A misdemeanor for some reason. The ropes were there for 15 days before they were cut down. Now, if they were really a danger to helicopters, whether they're logging or emergency, it seems like somebody would have done something before that. And when they actually were cut down, they were cut down by a deputy who was going up to try to effect an arrest, and he said that – he testified that he only cut them down because they were in his way on the climb up. He didn't testify that he cut them down because he had been told – now, these are posing a danger to emergency helicopters. I'm sorry. I just wondered if they testified that they knew that protest site was to prevent helicopters from landing, why does all this matter? Because if they don't want helicopters to land there, and there's a possibility that they could land there in an emergency or otherwise, don't they essentially admit the elements of the crime through that, what might be construed as a narrow admission but actually kind of is the whole ball of wax? Except for the statute requires that there actually be contact between the person and the device. It says subsequent – by the action of any person making contact with such device subsequent to the assembly or placement. So in other words, for somebody to break the law, they actually have to set something up where it's possible that somebody – that another person is going to come into contact with that. Now, if they know there aren't going to be helicopters coming there, then – and there aren't going to be helicopters coming there, then there's no chance of any contact. Was there no evidence that the defendants had any contact with the wires on the lines? Wasn't there evidence that they adjusted them upwards in the space? There is evidence that the one rope that was hanging between their two trees, that they did adjust that. The other ones, they couldn't have adjusted because they were in the trees the whole time, so there's not – it wouldn't be possible for them to stay up in the tree and also go tie it to the other tree that it's tied to. Counsel, this is not either brief, but is there a Booker fan-fan issue here in the sense that there might have been – any of these elements of the sentence would have been beyond the guidelines? Well, to get back to the restitution issue, normally if restitution were mandatory, I'm not sure whether there would be a Booker issue, but because in this case it was not mandatory and it was imposed under the probation statute, then it's something that is above and beyond whatever other aspects of the sentencing there are that are, you know, in some sense required by a conviction. So I think that the restitution in this case is more punitive in the sense that the judge didn't have to impose it. And, I mean, of course, we don't agree that it was rightly imposed anyway because it wasn't caused by the defendant's actions. It was caused by the government. But you're not going to make a Booker fan-fan argument? Well, I do think that the restitution – Or are you? I'm not – I'm kind of confused by your response. Well, I have stronger arguments, I believe, about restitution in that it wasn't caused by their conduct. But I also think that because restitution was discretionary and it wasn't found by the court that they had caused the government to starve them and dehydrate them and therefore incur medical costs and they hadn't caused the government to rent the cherry picker to take Ms. Smith out of the tree, there's never been any proof about that. So that restitution was imposed based on facts that weren't proved to a jury or something. You indicated you might want to reserve. Yes, Your Honor. Thank you. You may do so. May it please the Court. I am Josh Van De Wettering, assistant United States attorney out of the Missoula office representing the United States in this appeal. And I can assure Mr. Avery out of the chutes that he has done his clients no wrong by pointing out to me the issue of restitution because this case was not charged on the basis of a couple of thousands of dollars of restitution, which we burned up long ago simply in trying this case. The case was charged under this statute because this statute fits so well. Congress here has prescribed a very particular kind of conduct. They've said you may not employ these dangerous devices with the intent to disrupt a logging sale. Well, that's precisely what these defendants did here. They've acknowledged that their purpose in going to this site was to disrupt the logging sale. And, of course, as we argued to the jury, they did not choose a proposed helicopter landing site at random within the boundaries of the proposed logging sale. They chose it because to position themselves there would effectively disrupt a larger area because in a helicopter landing site you couldn't bring your helicopters in. I think the problem with Mr. Avery's argument is it leaves us with the question, well, how do you explain what those ropes are? If not to disrupt helicopters. And that I think ultimately is a jury question, but I'll address it since he's raised in his brief the question of the sufficiency of the evidence. There's only one explanation for the yellow polypropylene ropes. They're not effective as climbing ropes. One of them was well over 200 feet across the landing site. And that explanation, of course, is that they're there to prohibit or to stop helicopters from coming in. I think that leads us to the next problem with Defendant's argument, which is that they're essentially playing the two elements against each other here, suggesting that if the hazard, if the dangerousness of the device is evident, that is to say if it does its job, thereby stops the logging sale, you can't have convicted us. Mr. Avery seems to be arguing, and I presume really that he's not, that the helicopter would have to crash first before or the injury would have to happen. No, I think he's arguing that a plane and obvious danger is not a hazard. For instance, if instead of doing this, they had built three concrete pilings and put them in the road where the trucks for the logging company were to come up the road, they were so obvious and anybody would have to see it who's driving with the lights on or during the daytime. And so therefore, plane and obvious instructions are not hazardous. Well, I would suggest, Your Honor, there's a difference between an obstruction and a placed hazard. A big piece of concrete that's designed to stop is not a device that's designed. So you say that perhaps if these ropes had been in dayglow and been more obvious, they wouldn't have been hazardous. I can't think of a way that ropes could be not hazardous to a helicopter strung between trees as they were. I suppose I could envision if you could somehow completely cover the site in a blanket or ropes or something like that, then you would have an obstruction as opposed to a dangerous device. But I think ultimately that's a jury question. I can also imagine pieces of concrete in the road that are not so obvious that they are not so big that they're obstructions and instead just dangerous. I took his point to be that because this wasn't really yet a helicopter landing site or at least no notice that it was because it hadn't been activated, so to speak, that it couldn't be a hazardous condition. It would be equivalent to stringing something in an abandoned site. This one just hadn't been activated. What is your response to what I thought was a central argument? Well, I think, Your Honor, the problem with that argument is it's belied by the facts. We raise again the question, well, what are these ropes for, if not to block the helicopter? And there's simply no other explanation other than that that I can see. And we certainly argued that to the jury, and I think the jury accepted our arguments in that regard. That's where I think Mr. Avery's tent analogy fails. You look at the ropes for a tent, you can see what the purpose is, what the intent is, as Congress put in the statute, of course, to keep your tent up. And in that regard, I think his grammatical error with respect to the statute fails too because the very two items on either side of lines or wires in the statute are not items which are normally hidden or which are designed for dangerousness. Sharpened stakes, for instance, you use with your tent to hold the tent down. They only become dangerous when they're employed in a certain fashion. Similarly, lines with hooks attached have perfectly legitimate uses and are only but could be used, as the stakes could be, to present dangerousness without being hidden. I would analogize it to a bank robber going into a bank and pointing his gun and saying, my gun isn't dangerous as long as you give me the money because I'm not going to shoot you. And I have every confidence that the teller would disagree with that. It's a form of extortion, and that's essentially what the protesters are doing here. They're saying, if you don't stop logging, your helicopter's going to crash. And that, of course, is that's how they achieve their intent is to employ this dangerous device. The statute fits perfectly, which is why I chose this statute to use. And I think the signs analogy is similarly flawed. You can see what the intent is with the signs. But, sure, if you employed the signs in a certain fashion, they would become a dangerous device. On the restitution issue, under the sentencing guidelines, was the judge required to order restitution? I don't believe he was under the guidelines, Your Honor. And I don't believe there's a Booker-Fan-Fan issue in this case for that reason. I've gone over the guidelines again and reread Booker. And I don't see any factor which in the restitution or the probation factors which would not be present pre-Booker or would not be present by the proof that the United States presented. It's sort of a little bit different question I had, and that is, if under sentencing guidelines he was required to enter restitution and then the guidelines become advisories, we don't know whether he would or wouldn't have. It's not the normal Sixth Amendment problem of Apprendi and Booker combined. So one of the things we're considering, and haven't yet resolved necessarily, is what to do with those cases where you sentence somebody under the guidelines because you think that's what applies. And if you now say to the judge, you're not required to go by the guidelines, but it is advisory, would the judge change his decision? I understand. So that's my question, is whether we kind of have that here. And you know, to tell you the truth, I didn't read the guidelines or Booker with that particular question in mind. I know that we argued the restitution question simply on the statute, and it's clearly within the court's discretion. But it's not mandatory, you said. It's not mandatory under the statute. The restitution part. Correct. Okay. Is it mandatory under the guidelines, under 5E1.1? And I'm sorry, Your Honor, I can't answer that. So let me just ask you this. Is it clear that the judge imposed the restitution solely under his statutory authority? I believe it is under the record, Your Honor. He made a record of why he was doing that, and both parties addressed that statute in at least our oral arguments to the magistrate. Well, with respect to the medical expenses, you heard counsel's argument. Are these, in fact, direct and foreseeable costs or not? I think they are costs that are directly caused by the defendants in this case that go outside the realm of normal investigative costs. And one of the cases on making that distinction, I believe, is a drug case. And I'm sorry I don't have the name or the citation at my fingertips. But this court concluded ultimately in where drug agents let some money go. They purchased drugs and let the money go. They then wanted restitution. This court said you got what you paid for. You went to buy some drugs and you got it. And the United States' contention here would be the United States did not get what it paid for. The medical care, in fact, went to these people. They're the ones who got the benefit of these costs. And so it's very appropriately used or very appropriately ordered as restitution. Counsel, there's another aspect of the sentence that I'm concerned about, and that is that there was an order to stay out of National Forests during the probation period. And counsel says that that was a violation, failed to preserve the record, but at least we have to look at it from a plain error standpoint. We have the Wise case, which apparently requires that notice be given. What's your response? Your Honor, I'm trying to remember. We had two hearings with respect to the sentencing in this case, one with respect to restitution for the logging company only. I honestly can't remember if there was what the pre-sentence report might have said about that possible. Well, apparently there was nothing in the PSR about staying out of the forests. If I understand the argument correctly, we can hear from Mr. Avery again. But what about the notion, again, we're at plain error now, not purely erroneous. And we would argue there's no plain error, Your Honor. Substantial rights haven't been affected, particularly in this case since the defendants, or at least one of the defendants, asked for a modification of the court's general order to stay out of the National Forests. We agreed to that modification, that they could go in for recreational purposes as long as they ran that past their probation officer. Was that amendment allowed? That amendment was accepted by the magistrate court, Your Honor, yes. So it's a mood issue, you think? Well, you know, the record is sort of muddled, frankly, right there. There were two defendants in the case. One defendant argued for this modification and I think accepted that. I believe that was Mr. White. Counsel for Ms. Smith, I believe, simply objected to the broadness of the order generally and left it at that and did not acquiesce in the modification. All right. Anything further? Nothing further, Your Honors, unless you have further questions. Thank you, counsel. Mr. Avery, you have some reserved time. Thank you, Your Honors. And I'll try to demuddle the record, because I'll just get to the last point that Your Honors was – were inquiring about. And what happened was there was the condition that – first, the proposed condition was that they not be allowed to go in the national forest system at all for the next three years. And one of the defendants objected to that. And then the court said – and the specific objection was, well, they can't then get to wilderness area because you've got to go through forest system area to get to wilderness area. And the judge said, okay, well, then you can go through national forest system to get to wilderness area so long as you ask your probation officer first. And then after that, the other defendant said, I still object. And that objection was noted. So this guy – Yes, but you represent Mr. Wyatt. At the time, I represented – You did not object. Ms. Smith. I was the one who made the objection based – Okay. But we only are looking at Mr. Wyatt here, or are we looking at both?  Both.  Yes. But it was – it was objected to on behalf of one but not the other? Well, I objected on behalf of my client, and my co-counsel objected on behalf of her client. But the point is, when I made my objection, that was out of ignorance, again, as I – like the beginning of this argument. I just assumed that you can't get to wilderness area unless you go through the national forest system. That's not true. And so I made an objection on the cuff. Okay. But when the modification was made in response to the objection, you acquiesced, did you not? At that point, I acquiesced. But the point of oblige, I think, is so that people have notice and they can talk to their counsel and counsel can talk to them. I made my objection thinking you can't get to wilderness area unless you go through national forest system. These people are – you know, they love nature. They need to convene with nature. But they got the remedy they asked for. Well, that's because I didn't have time to say, you know, Your Honor, actually, they should be able to go to national forest system as long as they're not engaging in logging protests. That's the objection that I would have made if I had been given any notice about the condition at all, which is what WISE is about. Thank you. Mr. Van de Wetering talks about how this – the question of whether or not these ropes were dangerous devices was submitted to a jury. But we're talking actually about a legal question, whether or not the statute is vague as applied to this case. And so a jury doesn't get to decide whether or not that's the case, whether it's unconstitutionally applied. That's a legal matter. The court's supposed to decide that. We briefed the court round after round and argued it, you know, in between trial sessions, and we were shot down every time. But it's the legal question that the court should have answered. And so it's not a jury question whether the statute's informationally vague here in this case. Again, getting back to the examples of tent stakes and tent ropes, there were tents that were used by my client's support group, the people that were on the ground. Those people were there to obstruct the harvesting of timber as well. Those tents were there because that's what they were doing. And so those devices, those tent stakes and those ropes they used could fit under this statute as well, too, if these ropes can, no matter how obvious they are. And, Justice Day, I appreciate your example of the concrete pillars because that's exactly what's going on here. These were things that everybody saw from day one. The Forest Service spokesperson said, nothing illegal is going on. It was reported in the newspapers. And she was referring to the protestors and also the ropes. And so everybody knew what was going on here. It was just after the fact that a more convenient statute was applied. Thank you, Counselor. Your time has expired. The case just argued will be submitted for decision. And we will hear argument in the United States v. Jensen.
judges: O'scannlain, McKeown, Bea